"FINAGRAIN" COMPAGNIE COMMER-CIALE AGRICOLE et FINAN-CIERE, S. A., Plaintiff,

v.

MILLER COMPRESSING COMPANY et al., Defendants.

Civ. A. No. 69–C–497.

United States District Court,
E. D. Wisconsin.

Oct. 27, 1972.

Ben G. Slater, Milwaukee, Wis., for plaintiff.

Paul J. Kraemer, Milwaukee, Wis., for defendant Miller Compressing Co.

Gerald A. Flanagan, Wauwatosa, Wis., for defendants Tom Wegener, Best Cranes, Inc., and Vince L. Schneider Enterprises, Inc.

## MEMORANDUM DECISION AND ORDER

REYNOLDS, District Judge.

This case arises out of a loading accident that damaged a winch on the ocean-going vessel Santiago which was owned by plaintiff. Plaintiff is a Swiss corporation; defendants are three Wisconsin corporations and one Wisconsin citizen. Defendant Miller Compressing Company (hereinafter "Miller") was the general contractor engaged to load the ship. For this operation Miller leased a crane from defendant Best Cranes, Inc., according to a written agreement which provided, among other things, that Best Cranes supply both machine and operator. Defendant Tom Wegener was that operator. Vince L. Schneider Enterprises, Inc., which owned and operated Best Cranes, its subsidiary, was named defendant but was later dismissed from the suit by stipulation of all the parties. The remaining parties have agreed to fix the damages at $4,500 and to dismiss plaintiff's claim. The cross-claims of defendants Miller, Best Cranes, and Tom Wegener are still before this court. The parties have agreed to submit to the court the question of ultimate responsibility for payment of the agreed damages. They have stipulated to the record before the court and have submitted briefs on the question of liability.

These claims raise two questions: first, for purposes of liability to plaintiff, was Tom Wegener a borrowed or special employee of Miller for this job, or did he remain in the employ of Best Cranes? Further, if by operation of law Tom Wegener became a special employee of Miller, was Best Cranes in choosing him as the operator to send to Miller so unwise as to be negligent? The second question concerns the legal effect of the indemnification clause included in the written rental agreement between Best Cranes and Miller. Applying Wisconsin law, I resolve both questions against Miller but find that these determinations do not dispose of the case. The record before me raises an issue of fact which must await determination by the trier of fact. That issue concerns whether or not Best Cranes was negligent in its choice of an operator for this job.

The accident occurred on or about November 16, 1968, the third or fourth day of the ten-day loading operation. It was a very windy, stormy day; the wind and choppy waves were causing the ship to move about. Wegener was using a crane with a five-ton magnet attached to its 100-foot boom. The cab of the crane was about twenty feet below the level of the deck. Wegener could not see the hold he was loading or the deck of the ship. Before each work shift, he and his signal man, who was an employee of Miller, would make practice runs to de-

termine the proper boom angle. Once set, this angle is changed only at the instigation of the signal man. Next, they would "mark" the ship at the point to which the boom should extend on a properly positioned swing. The crane operator controls the swing by playing out more or less of the line to which the magnet is attached and by varying the speed of the swing. It is important to establish a consistent rhythm. Because of the operator's limited visibility, it is the signal man's job to signal him to stop the swing if it is liable to hit somebody or something on deck, if the load is starting to "dribble," or for any trouble he can see arising. The operator watches for these signals.

The accident occurred early in the afternoon. Wegener swung one of the loads too low and hit a winch located next to the hold. The spotter failed to notice the situation until it was too late. He signalled emergency stop, but because of the momentum of a swing it was too late to prevent the damage. About half an hour after the accident, the loading operation was resumed with both Wegener and the signal man continuing the work.

▆▆ The first question to be decided is whether Tom Wegener, by operation of law, became a borrowed or a special employee of Miller for this job. The test or rules that Wisconsin law applies to determine whether or not a workman is a borrowed employee are straightforward, but when applied to the minute shadings that are at times the only distinction between fact situations, they are often confusing in result. In its most recent case on the subject, the Wisconsin Supreme Court raised the possibility of future revision, but for the present decided to hold its precedents. Freeman v. Krause Milling Co., 43 Wis.2d 392, 394, 168 N.W.2d 599 (1969). The Wisconsin test, affirmed once more in Freeman, was first established in its present form in Seaman

Body Corporation v. Industrial Commission of Wisconsin, 204 Wis. 157, 163, 235 N.W. 433 (1931): "The vital questions in controversies of this kind are: (1) Did the employee actually or impliedly consent to work for a special employer? (2) Whose was the work he was performing at the time of injury? (3) Whose was the right to control the details of the work being performed? (4) For whose benefit primarily was the work being done?" Wisconsin law also starts with the inference that the employee remains in the employ of the general employer. Freeman, supra, at 394, 168 N.W.2d 599.

▆ In a recent Wisconsin case, Huckstorf v. Vince L. Schneider Enterprises, 41 Wis.2d 45, 163 N.W.2d 190 (1968), involving a crane rental similar to that in the present case, the court found in the crane operator's actions an implied consent to work for the special employer. Huckstorf, supra, at 52–53, 163 N.W.2d 190. The court considered whether the workman reported directly to the site and who had the most direct control over his work on this particular job. Payroll is always considered in cases involving special employment, but who signs the paycheck is never decisive and rarely a significant factor. Here Wegener remained on his general employer's payroll as the worker in Huckstorf did. Wegener reported directly to the site and received all his instructions, down to the most precise detail, from Miller's employees. Most cases that find no implied consent do so because the employee has expressly refused consent or because he has refused to follow the directives of the putative special employer, running the job himself instead. Skornia v. Highway Pavers, Inc., 39 Wis.2d 293, 159 N.W.2d 76 (1968). Though Wegener was carried on Best Cranes' payroll, the rest of his performance and his acquiescence to Miller's instructions are sufficient to imply consent.

■ The second and fourth questions, asking whose work was performed and for whose benefit the work was performed, are closely related and I will treat them together. In the kind of situation this case involves, where the general employer's business is to furnish men and machines to perform work for the special employer, the work really benefits both employers. Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614 (1951). *Nepstad* is a Minnesota case that applies Wisconsin law to a borrowed employee situation. It faced the same conceptual problem; benefit is not a sufficiently discriminating test. The court there felt that the essence of the "whose business" or "whose benefit" test as applied to a rented machine and operator is control which is the basis for the third and final question under Wisconsin law.

■ But control too is an ambiguous measure. Courts have considered payroll, power to select and dismiss, and the duration and location of the job in their decisions about control. They have singled out the right to control the details of the work as an important factor, but have said that directing where and when the work is to be done is not enough. Edwards v. Cutler-Hammer, Inc., 272 Wis. 54, 74 N.W.2d 606 (1956); Wagner v. Larsen, 174 Wis. 26, 182 N.W. 336 (1921). The inquiry is complicated by the fact that in many cases, and certainly all cases concerned with the rental of a machine and operator, both the general and special employers possess and exercise control over the operator but to different ends. *Nepstad,* supra, 50 N.W.2d at 621; Wagner v. Larsen, supra, at 29, 182 N.W. 336. In the instant case, Wegener was paid and presumably insured by Best Cranes which had the ultimate right to fire or reassign him and had complete control over the care and upkeep of its crane. Miller, on the other hand, controlled all the details of the loading operation. It is logically consistent with the control test to find a

worker the servant of his general employer for some things, like the maintenance of the machine, and the borrowed servant of his temporary employer in others; for example, a loading operation. The question is when the degree of control exercised is sufficient to find a master-servant relationship. *Nepstad,* 50 N.W.2d at 622, suggests that the appropriate test is whether the orders of the borrowed employer have the force of command, rather than mere requests, and decides that it is not necessary that the penalty for disobedience be discharge in order to find a borrowed employee relationship. Essentially this test asks whether the employee "acted like" a contractor, coming in for the job and controlling the way he performed it, or whether he was assimilated into the temporary employer's team.

■ In the instant case Miller pointed out what material was to be loaded and where and when the loading was to be done. The signal man set the boom and the mark, thereby patterning the swing it was Wegener's job to reproduce as precisely as possible. It was also the signal man's responsibility to watch each swing and signal emergency stop when necessary. In the instant case the signal man also suggested several modifications in the swing in order to make it closer to the mark. Though the crane operator here was more than the virtual "automatic eye" that the employee in *Nepstad* was compared to, Miller had control over each individual swing, not just the general operation. Wegener and his spotter worked as a unit. Essentially he was assimilated into Miller's crew for the duration of the operation, submitting entirely to Miller's direction. I find that as a matter of law Wegener became the borrowed or special employee of Miller for this operation and that Miller is liable, under the doctrine of respondeat superior, for his negligence as well as that of the spotter.

■ The second question to be answered in determining legal responsibili-

ty for plaintiff's damages concerns the indemnification agreement signed by Miller and Best Cranes. It provided in part as follows:

"2. INDEMNIFICATION: Lessee agrees that the equipment and all persons operating such equipment, including Lessor's employees, are under Lessee's exclusive jurisdiction, supervision and control and agrees to indemnify and save Lessor, its employees and agents harmless from all claims for death or injury to persons, including Lessor's employees, and from all loss, damage or injury to property, including the equipment, arising in any manner out of Lessee's operation. * * *

"Lessee shall not be required to indemnify Lessor for its sole negligence * * *."

My preceding determination that Wegener became a special employee of Miller for this job eliminates Miller's sole argument that the indemnification agreement does not cover the present situation. I find that under the agreement, Miller is liable for the entire sum owed plaintiff.

█ There is, however, one remaining issue—one that cannot be decided on a motion for summary judgment. Miller alleges that Wegener was inexperienced and that Best Cranes was thus negligent in supplying him for this operation. Miller's signal man made this protest to his immediate superior, but there is no record of any further action. This raises a matter for the trier of fact to decide.

Thus, my decision that Wegener was the special employee of Miller and that Miller is liable under the indemnification agreement does not dispose of the case. A final determination of liability must await a decision about Best Cranes' alleged negligence, and if they are found negligent, whether or not the indemnification clause covers that negligence.