ESCHER, Appellant, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS and others, Respondents. [Case No. 309.]

MONROE CHEESE CORPORATION and another, Appellants, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS and others, Respondents. [Case No. 318.]

*Nos. 309, 318. Argued June 3, 1968.—Decided June 28, 1968.*
(Also reported in 159 N. W. 2d 715.)

528

For the appellant Fred Escher there was a brief by *Lawton & Cates* and *John C. Carlson,* all of Madison, and oral argument by *Mr. Carlson.*

For the appellants Monroe Cheese Corporation and United States Fire Insurance Company there was a brief by *Hart, Kraege, Wightman, Bieber & Thurow* of Madison, and oral argument by *Arnold J. Wightman.*

For the respondent Department of Industry, Labor & Human Relations the cause was argued by *Gordon Samuelsen,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

For the respondents Kraft Foods Division of National Dairy Products Corporation and Ideal Mutual Insurance Company there was a brief by *Ralph Wm. Bushnell* and *Stafford, Rosenbaum, Rieser & Hansen,* all of Madison, and oral argument by *Mr. Bushnell.*

CONNOR T. HANSEN, J.  Escher is an expert cheesemaker and consultant, specializing in the manufacture and grading of Swiss cheese.  For about five years prior to May, 1965, he was employed in the forenoon by Monroe Cheese which is owned and operated by Edwin Rufenacht.

Foreign Type is a nonprofit association engaged in laboratory and research work in cheesemaking.  Escher was the only person on the association's payroll and worked for them in the afternoon.  In addition, Escher worked at a local marina on weekends in a capacity other than a cheese expert.

Monroe Cheese did not make cheese, but was engaged in the purchase of cheese from various plants in the Monroe area and the resale thereof.  Monroe Cheese employed Escher to work on quality control of the cheese being manufactured in the various plants from which Monroe Cheese made purchases.

Kraft was not organizationally related to Monroe Cheese but was a very good customer.  Sometime prior to 1965, Kraft determined to initiate a Swiss cheese manufacturing program in Venezuela.[1]  Kraft had no one

---

[1] The record reveals that Monroe Cheese assisted Kraft in the purchase of certain used equipment for the Venezuelan operation. Also, Monroe Cheese did not trade in the purchase or sale of

available to develop this program and, therefore, approached Rufenacht for assistance in securing personnel. Finally, in April of 1965, Rufenacht approached Escher, who eventually agreed to go to Venezuela if his wife could accompany him.

Arrangements were made directly between Monroe Cheese and Kraft to have Escher remain on the payroll of Monroe Cheese, Foreign Type and the marina while he was in Venezuela. Kraft was to reimburse Monroe Cheese the total salaries which were paid to Escher by all three and Monroe Cheese, in turn, would reimburse Foreign Type and the marina. Among other things, Escher remained on the Monroe Cheese records for workmen's compensation purposes.

Virtually all of the other details relating to the trip to Venezuela were made and paid for directly by Kraft.

In April, 1965, Escher and his wife went to the Kraft offices in Chicago and were taken to a physician, chosen by Kraft, who administered the necessary vaccinations which are alleged to be the basis for the instant workmen's compensation claim. After several other conferences with Kraft officials, Escher and his wife went to Venezuela where he commenced working in Kraft's plant. After about a week he became disabled and returned to Wisconsin.

The Department included in its findings of fact, the determination that Escher was not an employee loaned to Kraft, but continued to be an employee of Monroe Cheese.

We view this case as being one in which the undisputed facts permit the drawing of different inferences. It, therefore, follows that the permissible inference drawn by the Department is an act of fact-finding, and that such inference constitutes a finding of ultimate fact and not a conclusion of law. *Gant v. Industrial Comm.* (1953), 263 Wis. 64, 69, 56 N. W. 2d 525; *Hanz v. Industrial*

cheesemaking equipment as part of its usual activity. In this instance, Monroe Cheese merely accumulated said equipment at Kraft's request and received no profit on the sale to Kraft.

*Comm.* (1959), 7 Wis. 2d 314, 316, 96 N. W. 2d 533. Although the existence of the employer-employee relationship is generally a question of law, a question of fact is presented where there is room for dispute as to inferences to be drawn from the facts. *Harry Crow & Son, Inc. v. Industrial Comm.* (1963), 18 Wis. 2d 436, 440, 118 N. W. 2d 841; *Duvick v. Industrial Comm.* (1963), 22 Wis. 2d 155, 163, 125 N. W. 2d 356. This becomes significant in determining the standard of review by this court. Therefore, having determined that the undisputed facts permit the drawing of different inferences and that the determination of such inferences constitutes a finding of ultimate fact by the Department, it follows that if there is credible evidence to support the Department's finding of fact, such finding, in the absence of fraud, is conclusive upon the court. *Hanz v. Industrial Comm., supra,* at page 316. Sec. 102.23, Stats. *Springfield Lumber, Feed & Fuel Co. v. Industrial Comm.* (1960), 10 Wis. 2d 405, 409, 102 N. W. 2d 754, reviewed and set forth the criteria to be used in considering the problem of the loaned employee:

"The essential tests to be applied in determining whether a loaned employee retains his employment with his original employer, or becomes the employee of the special employer, are set forth in *Seaman Body Corp. v. Industrial Comm.* (1931), 204 Wis. 157, 163, 235 N. W. 433, as follows:

" ' The vital questions in controversies of this kind are:

" ' (1) Did the employee actually or impliedly consent to work for a special employer?

" ' (2) Whose was the work he was performing at the time of injury?

" ' (3) Whose was the right to control the details of the work being performed?

" ' (4) For whose benefit primarily was the work being done? ' "

In addition, there is a presumption that the employee continues in his general employment. *Edwards v. Cutler-Hammer, Inc.* (1956), 272 Wis. 54, 56, 74 N. W. 2d 606;

*Braun v. Jewett* (1957), 1 Wis. 2d 531, 538, 85 N. W. 2d 364.

The first is the most important of the aforementioned tests, *i.e.*, did the employee actually or impliedly consent to work for the special employer. *Springfield Lumber, Feed & Fuel Co. v. Industrial Comm., supra,* at page 409; *Skornia v. Highway Pavers, Inc.*, ante, p. 293, 159 N. W. 2d 76.

There is an important distinction between the mere consent of an employee to perform certain acts on behalf of or for the benefit of the special employer and the consent to leave his employment and enter into a new employer-employee relationship, of even a temporary nature. *See Springfield Lumber, Feed & Fuel Co. v. Industrial Comm., supra,* at pages 410–413. In the case under consideration, the determination of whether Escher consented to enter into a new employer-employee relationship with Kraft and consented to leave, even though temporarily, his general employer, constitutes a determination of ultimate fact by the Department based upon different and conflictive inferences as to Escher's employment relationship. *Hanz v. Industrial Comm., supra,* at page 318.

It is undisputed that Escher consented to go to Venezuela to assist in establishing a Swiss cheese operation for Kraft. The duration of his trip was to be six or eight weeks. He was initially approached by Rufenacht, the owner of Monroe Cheese. Significantly, however, Escher testified that he had no intention of severing his employment with Monroe Cheese, nor did he intend to become an employee of Kraft. This testimony is substantiated by that of Claude Ray Price, production manager of Kraft, and that of Rufenacht who indicated that while Escher was in Venezuela, Monroe Cheese considered him as their employee. *Rhinelander Paper Co. v. Industrial Comm.* (1931), 206 Wis. 215, 217, 239 N. W. 412.

Considering the other criteria set forth in *Springfield*, it is undisputed that the entire Venezuela operation was a Kraft venture. However, in terms of customer good will, it cannot be said that Monroe would receive no benefit from the arrangement. Escher was an undisputed expert in his field and consequently vested with a considerable degree of independence. He testified he controlled the details of his own activities. We do not attempt to set forth all of the evidence in support of the findings of the Department, but observe there are other relevant factors. A letter from Kraft to Monroe Cheese reveals that the purpose of the special payroll and reimbursement arrangement was to protect Escher to keep his fringe benefits intact. Also, both Escher and Rufenacht indicated that had the injury not occurred, the ultimate determination as to how long he would remain in Venezuela would probably have been between Escher and Rufenacht.

The systematic and definitive analysis of the employment relationship of Escher in terms of the aforementioned tests is somewhat frustrated by virtue of his status as an expert. However, the rationale of *Visiting Nurse Asso. v. Industrial Comm.* (1928), 195 Wis. 159, 164, 217 N. W. 646, is supportive of the conclusion herein reached. In that case the employee remained on the payroll of the association while performing services for a special employer. She was performing professional services and receiving the same rate of pay and her general employer received some benefits of the arrangement.

We, therefore, conclude that the undisputed facts in this case give rise to different and conflicting inferences as to Escher's employment relationship. As such, the inference that Escher remained an employee of Monroe Cheese, as determined by the Department, constitutes an ultimate finding of fact, which is supported by credible evidence and therefore becomes conclusive on review.

In Case No. 309, it is contended that Fred Escher is an aggrieved party within the meaning of sec. 102.23, Stats., which provides in part as follows:

"102.23 **Judicial review.**

"(1) The findings of fact made by the commission acting within its powers shall, in the absence of fraud, be conclusive; and the order or award, either interlocutory or final, whether judgment has been rendered thereon or not, shall be subject to review only in the manner and upon the grounds following: Within 30 days from the date of an order or award originally made by the commission as a body or following the filing of petition for review with the commission under s. 102.18 any party aggrieved thereby may commence, in the circuit court for Dane county, an action against the commission for the review of such order or award, in which action the adverse party shall also be made defendant."

As previously stated, the appeal in Case No. 309 was filed prior to the appeal in Case No. 318. Escher was properly made a party defendant in the appeal in Case No. 318. Upon stipulation, the two cases were consolidated for purposes of appeal. The purposes for Escher's appeal in Case No. 309 have been effectively protected by the appeal in Case No. 318. On oral argument, counsel conceded that under the circumstances above set forth, the issue of whether Escher was an "aggrieved party" within the interpretation of sec. 102.23, Stats., had become academic. It, therefore, becomes unnecessary to further consider the issue raised in Case No. 309.

*By the Court.*—Appeal dismissed as to Case No. 309. Judgment affirmed as to Case No. 318.